IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86521-8-I |
| Respondent/Cross-Appellant, | |
| v. | DIVISION ONE |
| JOSEPH FOREST SIMS, | |
| Appellant/Cross-Respondent. | UNPUBLISHED OPINION |

CHUNG, J. — Joseph Sims was convicted of two counts of burglary in the first degree, two counts of kidnapping in the first degree, one count of rape in the first degree, three counts of assault in the second degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the first degree. Prior to trial, Sims twice moved to represent himself, and the court granted his second motion. On appeal, Sims claims (1) admission of certain statements violated his Fifth Amendment right against self-incrimination; (2) the trial court's order that granted his request to exercise his right to represent himself violated his right to counsel; and (3) the conviction of unlawful possession of a firearm in the first degree violated his Second Amendment right to bear arms. We affirm.

BACKGROUND

The underlying actions in this case took place in June 2021. On June 10, Joseph Sims broke into S.M.'s house, aimed a pistol at her, held her against her will, and raped her. S.M. reported Sims to the police and went to stay at a hotel. Three days later,

S.M.'s roommate K.F., who had stayed out of the house after hearing about what happened, returned to their home. K.F. alleged that Sims broke into the house through a glass door, pointed a gun at her, forced her into his vehicle, zip-tied her, drove her to S.M.'s parents' apartment and shot at it, drove her to another residence and shot at it, then drove her to a Shell gas station and let her leave.

Afterwards, Sims went to the University of Washington Police Department (UW Police) around 6:30 a.m. He contacted dispatch through an intercom in the vestibule to the police department, a small room with a door that led to the main police station lobby and another door that opened to the street. He told dispatch that he wanted to turn himself in on an arrest warrant from Arkansas. UW Police Officers Jacqueline Scott and Warren Bresko were assigned the call.

When Scott arrived, she found Sims sitting on the floor of the vestibule, with his back against the wall and his hands on his legs. Scott testified that she asked Sims if he was there to turn himself in on a warrant, and he responded, "Yeah." Scott then told Sims that she would not take him to jail for the warrant out of Arkansas and that she was unsure how she could help him. Sims told Scott that the Seattle Police Department was looking for him and that she would want to handcuff him. When Scott asked for Sims's identification, he handed her his wallet, which she declined to accept and asked for just his identification. After Bresko arrived, the officers asked Sims why he thought they would want to handcuff him. Sims told them, "When you learn who I am, you are going to want to put me in handcuffs." The officers "asked why." Sims "said something to the effect that they (police) would want to put him in handcuffs for their own safety." Sims was then placed in handcuffs, and Scott told Sims he was being detained only

2

until they could figure out what was going on with the warrant. Once in handcuffs, without being asked a question, Sims said he "did all those burglaries and shootings."[1] Bresko then gave Sims the Miranda[2] warning. Sims thereafter declined to speak with the police, and they asked him no questions.

Later, while Sims was still in custody, "Seattle Police had a question about his car," and Sims "overheard the inquiry in the discourse between officers." The court found as an undisputed fact in its CrR 3.5 order that "[w]ithout being asked any question, [he] made a statement to the effect that the car was gone or in somebody else's hands."

Sims remained in custody as UW Police waited for information from their dispatcher as to "what we had going on with Mr. Sims." UW Police's contact with Sims ended after they "got information" that Sims was the subject of "an investigation with multiple agencies" and that the Bothell Police Department would "pick him up" as a result of these investigations.

In preparation for trial, Sims moved to exclude the statements he made in the vestibule at the UW Police Department. After a CrR 3.5 hearing, the trial court held that Sims was in custody from the moment he was handcuffed, but that his statements before being handcuffed were voluntary and admissible. Further, the court held that his statements after being handcuffed—that he "did all those burglaries and shootings" and that "the car was gone"—were not prompted and were not the product of custodial

---

[1] Although in the court's oral ruling, it confusingly states at one point that the shooting statement *was* in response to a question, then later, that the statement about the shooting *was not* in response to a question, the written order controls. State v. Skuza, 156 Wn. App. 886, 898, 235 P.3d 842 (2010) ("To the extent its oral rulings conflict with its written order, a written order controls over any apparent inconsistency with the court's earlier oral ruling.").

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

interrogation; thus, they were voluntary and admissible. Pursuant to the court's CrR 3.5 ruling, at trial, Scott and Bresko testified to Sims's statements that they were 'going to want to put [him] in handcuffs" and that he admitted to being involved in a shooting.

Sims first moved to represent himself on April 26, 2022. On May 13, 2022, the court heard the motion. After an extensive colloquy, the trial court was not satisfied that Sims's request was unequivocal. The court reserved decision on Sims's motion and ordered reassignment of counsel. On May 20, Sims was appointed new counsel. One week later, Sims renewed his motion to represent himself. At a June 10 hearing on the motion, after another colloquy, the trial court was satisfied that Sims's request was now unequivocal and was made knowingly, intelligently, and voluntarily and granted the motion. Sims also signed and filed a written waiver of the right to counsel.

In December 2022, Sims filed a motion for standby counsel, which the trial court granted. In December 2023, Sims moved to "remove standby counsel." After again engaging in a colloquy with Sims, the court granted the motion.

In April 2024, a jury convicted Sims of 10 total counts: drive-by shooting, rape in the first degree, unlawful possession of a firearm in the first degree, two counts of burglary in the first degree, two counts of kidnapping in the first degree, and three counts of assault in the second degree. The jury also returned special verdicts finding a number of special enhancements. As to all counts, the jury found that each charge was a "crime committed while on community custody" because Sims committed the crimes "shortly after being released from incarceration." As to the kidnapping, burglary, and assault charges, the jury returned special verdicts that Sims was "armed with a firearm at the time of the commission of the crime." As to the rape, kidnapping, and burglary

4

charges, the jury returned special verdicts involving domestic violence because the victim was an "intimate partner." Lastly, the jury found that Sims "used a motor vehicle" in the commission of the drive-by shooting.

The court sentenced Sims to an indeterminate sentence of 318 months to life for rape in the first degree and to a total of 910 months of total confinement for the other counts. Sims timely appeals.[3]

DISCUSSION

On appeal, Sims raises several claims. He challenges the admission of statements he made while at the UW Police Department as a violation of the Fifth Amendment. He also claims the trial court's granting of his motion to exercise his right to represent himself violated his right to counsel. Finally, he argues that the conviction for unlawful possession of a firearm violated his Second Amendment right to bear arms. We affirm.

I. Admission of Statements to UW Police

Sims challenges the court's admission of statements he made in the UW Police Department vestibule, claiming the court should have excluded them because he made them involuntarily and while he was in custody. We disagree.

When reviewing a court's ruling on a CrR 3.5 motion, "[w]e review the trial court's findings of fact for substantial evidence." State v. Mayer, 184 Wn.2d 548, 555, 362 P.3d 745 (2015). We review the trial court's conclusions of law de novo. Id. Sims assigns error to the court's "written findings that [he] was not subjected to custodial

---

[3] The State initially filed a notice of cross-appeal but subsequently withdrew it. Additionally, the State filed a motion to strike Sims's statement of additional authorities filed after oral argument because it did not comply with RAP 10.8(a). We grant the State's motion.

interrogation," citing to one page of the court's order, but without identifying specific facts that he disputes.[4] However, the court's determination that Sims was not subjected to custodial interrogation until he was handcuffed is a legal conclusion, not a finding. See, e.g., State v. Lorenz, 152 Wn.2d 22, 30, 36, 93 P.3d 133 (2004) ("whether an interrogation was custodial [is] reviewed de novo"). We thus review de novo the court's legal conclusion that Sims's "freedom of movement was not curtailed to a degree associated with a formal arrest before the police took steps to curtail it," and it was not until "[f]ollowing the police placing him in handcuffs, his freedom of movement was curtailed to a degree associated with a formal arrest."

Under the Fifth Amendment, a self-incriminating statement "must be made freely and without inducement or compulsion before it may be admitted as evidence against a defendant." State v. Ortiz, 104 Wn.2d 479, 484, 706 P.2d 1069 (1985). "The general rule is that a statement is voluntary if it is made spontaneously, is not solicited, and [is] not the product of custodial interrogation." Id.

We use "[a]n objective test . . . to determine whether a defendant was in custody—whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest." Lorenz, 152 Wn.2d at 36-37. "When making this determination, we apply an objective standard that asks whether, under the totality of the circumstances, a reasonable person in the suspect's position would have felt free to end the interrogation and leave." State v.

---

[4] As Sims notes in the relevant assignment of error, the order contains unnumbered paragraphs. The page to which he cites appears in a section labelled "Undisputed Facts." Thereafter is a section labelled "Disputed Facts," which contains only the word "None," and "Conclusions as to the Disputed Facts," which states, "None needed." The trial court also noted in its oral ruling "that there really aren't any disputes of facts." As Sims does not dispute any specific factual findings, the court's factual findings are verities on appeal. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

Magaña Arévalo, 5 Wn.3d 781, 796, 582 P.3d 330 (2026) (citing Howes v. Fields, 565 U.S. 499, 509 (2012)). "Relevant circumstances may include the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning." State v. Escalante, 195 Wn.2d 526, 534, 461 P.3d 1183 (2020). "[B]oth the conduct of law enforcement officers in exerting pressure on the defendant . . . and the defendant's ability to resist the pressure are important." State v. Scherf, 192 Wn.2d 350, 382, 429 P.3d 776 (2018). A statement is involuntary if it "was extracted by any sort of threats, violence, or direct or implied promises, however slight." State v. Riley, 17 Wn. App. 732, 735, 565 P.2d 105 (1977).

Sims argues that "the protections of Miranda applied to [him] from the time he came under supervision by police while he was inside the Department's vestibule" because "[t]he police officer who spoke with him . . . effectively hemmed him in, in that small space, where the only other exit from the vestibule was locked." The vestibule had two doors, one to 15th Avenue that remains unlocked and one to the inside of the police station lobby. At the CrR 3.5 hearing, Bresko described the vestibule as the "foyer of the department." At the front of the office, facing 15th Avenue Northeast, "[t]here's a set of doors that allows you to get to another . . . area between another set of doors," with a "call box in that area that allows somebody to be able to talk to our dispatch if they have questions or need an officer to come outside," and the main police lobby was through another set of doors. Bresko testified that when he arrived, Sims "was in the little space that was contained by the two sets of doors." According to Bresko, the exit to 15th Avenue Northeast was available to Sims "from the backside" of the foyer and was not

7

blocked. The trial court made the unchallenged factual finding that Sims's freedom of movement was not curtailed and that prior to being handcuffed, "[h]e could have exited onto 15th Avenue." To the extent Sims's movement was restrained, it was not the result of the police's presence or actions, suggesting he was not in custody. See State v. Kelter, 71 Wn.2d 52, 54, 426 P.2d 500 (1967) (defendant was not in custody while questioned in hospital because, among other reasons, the defendant had not "been placed under arrest or otherwise restrained *by the police* in any manner") (emphasis added).

Another "factor to consider in the totality of the circumstances analysis is whether the interrogation occurred in a police-controlled location." Magaña Arévalo, 5 Wn.3d at 796. "Interrogation in a police-controlled location points toward a custodial environment." Id. at 796-97. Sims argues that here, "the nature of the police officer's control over [him] was inherently coercive, since . . . it was police dominated, and the location away from the public inherently lent itself to aggressive questioning." He further claims "the circumstances became more and more police dominated." But the mere presence of numerous officers does not establish a custodial arrest. State v. Marcum, 149 Wn. App. 894, 909, 205 P.3d 969 (2009). In Marcum, the defendant was "by definition" "not free to leave" because he was under a Terry[5] investigative detention; nevertheless, "the fact that numerous police vehicles surrounded [the defendant] in the grocery store parking lot did not convert the investigatory detention of [the defendant] into a custodial arrest" for purposes of the Fifth Amendment. Id. Here, as in Marcum, the mere presence of multiple officers in the vestibule with Sims—even standing physically

---

[5] Terry v. Ohio, 392 U.S. 1 (1968).

above him, while he was sitting on the floor—did not convert the situation into a custodial arrest.

Sims also cites State v. Walton, 67 Wn. App. 127, 834 P.2d 624 (1992), in support of his argument. But in Walton, this court held that the defendant was *not* subject to custodial interrogation when he was questioned by an officer on the second story landing of an apartment complex, reasoning that "because [the officer] acted in a noncoercive, routine investigatory manner, [the defendant]'s inculpatory statement was not a product of custodial interrogation." Id. at 131. Here, like in Walton, the situation was not "police dominated," and the officers' questions were noncoercive and made in a routine investigatory manner. Id. at 130. It was Sims who initiated contact with the police after he arrived at the UW Police Department of his own free will and sat on the floor of the vestibule. He voluntarily provided his name to dispatch and said he wanted to turn himself in on a warrant from Arkansas. There is no evidence that law enforcement caused him, much less coerced him, to go to the police department, enter the vestibule, or engage with the police.

Further, neither Scott nor Bresko made any threats, showed their weapons, or made any promises in return for Sims speaking with them, which supports the trial court's conclusion that Sims made the statements voluntarily. Sims was not physically restrained, nor forcefully separated from his friends or family, nor ordered to move. Cf., e.g., Magaña Arévalo, 5 Wn.3d at 805 (defendant was in custody when he was physically restrained, separated from family, surrounded by police, ordered out of his house, and driven away). Indeed, when Scott first walked into the vestibule and Sims told her he was turning himself in, he "held his hands out in front of him, palms up."

Scott spoke to him from outside the vestibule and told him a warrant out of Arkansas was "not something that we would take you to jail on" so she was not sure how she could help him.[6] Far from coercive, these statements were basic clarifying inquiries posed in response to Sims's voluntary actions.

Sims also argues that he was in custody because "[t]here was little doubt that this detention [in the vestibule] was going to be ongoing – not temporary." However, it was *after* Scott told Sims she would not take him to jail on the Arkansas warrant that he *then* said, unprompted, "something to the effect of: When you learn who I am, you're going to want to put me into handcuffs." The fact that Sims made this statement spontaneously and not in response to any question from Scott supports the conclusion his statement was voluntary. See Ortiz, 104 Wn.2d at 484 (statement is voluntary if it is made spontaneously and is not solicited). After Bresko arrived, the UW police officers asked Sims why they would want to handcuff him, and Sims told the officers that they would want to handcuff him for their own safety. Only at this point did Scott handcuff Sims. According to Scott, she then reminded him "that he was only being detained at that time until we could figure out what was going on with that warrant." Then—not in response to any question—Sims stated something to the effect of "I did all those burglaries and shootings." At this point, Bresko advised Sims of his Miranda rights.

The facts here do not support the conclusion that Sims's freedom was curtailed to a degree associated with a formal arrest. And Scott and Bresko both testified that Sims did not appear to be under the influence of any substances or incapable of understanding what he was doing or saying. Cf. State v. Cuzzetto, 76 Wn.2d 378, 385,

---

[6] Scott testified that the warrant "later turned out to be not relevant" and that it was "a near hit," that is, "either a similar name or a similar date of birth."

457 P.2d 204 (1969) (support for voluntariness of statements where defendant's statements were " 'the product of a free intellect' " (quoting Vandegriff v. State, 219 Tenn. 302, 409 S.W.2d 370 (Tenn. 1966))). We hold that the trial court did not err in concluding that under the totality of the circumstances, prior to being handcuffed, Sims was not in custody, and he made the challenged statements voluntarily.

II. Right to Self-Representation

Sims sought to exercise his right to self-representation. After initially denying the request, the trial court later granted it. On appeal, Sims argues that the trial court erred in doing so. We disagree.

A criminal defendant has the constitutional right to the assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. A defendant may waive this right to counsel and exercise the right to self-representation. Faretta v. California, 422 U.S. 806, 806 (1975); State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010) ("Criminal defendants have an explicit right to self-representation under the Washington Constitution and an implicit right under the Sixth Amendment to the United States Constitution."). These competing rights to assistance of counsel and to self-representation are in tension. State v. DeWeese, 117 Wn.2d 369, 376, 816 P.2d 1 (1991). Trial courts engage in a two-step inquiry to determine whether to grant or deny a request to represent oneself: "[f]irst, the court must determine whether the request for self-representation is timely and unequivocal;" and "[s]econd, if the request is timely and unequivocal, the court must then determine whether the request is also voluntary, knowing, and intelligent." State v. Curry, 191 Wn.2d 475, 486, 423 P.3d 179 (2018). The request must be unequivocal "[t]o protect defendants from making capricious waivers of

counsel and to protect trial courts from manipulative vacillations by defendants regarding representation." State v. Stenson, 132 Wn.2d 668, 740, 940 P. 2d 1239 (1997).

We review a trial court's decision to grant a request to self-represent for abuse of discretion. Curry, 191 Wn.2d at 483-84. "Under an abuse of discretion standard, we do not reverse a trial court's decision unless the trial court applied the wrong legal standard, based its decision on facts unsupported by the record, or made a decision that is manifestly unreasonable—even if we may have reached a different conclusion on de novo review." Id. at 486. We give "great deference" to a trial court's decision to grant or deny a defendant's motion to exercise their right to self-representation, acknowledging that "[t]rial judges have far more experience considering requests to proceed pro se and are better equipped to balance the competing considerations" and "trial courts have the benefit of observing the behavior and characteristics of the defendant, the inflections and language used to make the request, and the circumstances and context in which it was made." Id. at 484-85. However, courts are to " 'indulge in every reasonable presumption against [the defendant's] waiver' of the right to counsel." State v. Sabon, 24 Wn. App. 2d 246, 251, 519 P.3d 600 (2022) (alteration in original) (quoting Brewer v. Williams, 430 U.S. 387, 404 (1977)).

Here, Sims does not argue that his request was not voluntary, knowing, and intelligent.[7] Rather, he claims the court erroneously determined his request was unequivocal.

---

[7] "The method for determining whether a defendant understands the risks of self-representation is a colloquy on the record. . . . So long as a trial court conducted an adequate inquiry into a defendant's request and there is a factual basis for the court's finding, . . the trial court's discretionary decision will not be disturbed on appeal." State v. Burns, 193 Wn.2d 190, 203-04, 438 P.3d 1183 (2019). Here, at both the

To be unequivocal, a request to self-represent must reflect " 'an explicit choice between exercising the right to counsel and the right to self-representation so that a court may be reasonably certain that the defendant wishes to represent himself.' " Curry, 191 Wn.2d at 490 (quoting United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994)). In determining whether a request to self-represent is unequivocal, we look to "the context of the record as a whole." Stenson, 132 Wn.2d at 741-42. "[W]hether a request for self-representation is unequivocal must be determined on a case-by-case basis, considering the circumstances, the defendant, and the request." Curry, 191 Wn.2d at 485. "[A] generally applicable rule cannot be effectively constructed" for this inquiry because it is "inevitably fact intense and involves the weighing of numerous factors." Id. Accordingly, our courts have intentionally "not articulated a bright-line rule instructing the trial court when to grant and when to deny a request for self-representation." Id. at 485-86. However, our Supreme Court has outlined "nonexclusive factors" to consider, including:

> (1) how the request was made—for example, was the request made formally in a motion or spontaneously at a hearing?; (2) the language used in the actual request—for example, was the defendant asking to proceed pro se or expressing frustration?; and (3) the context surrounding the request—for example, was the request made after counsel sought a continuance or because of a disagreement regarding strategy?

---

May 13 and June 10 hearings, the trial court engaged in an extensive colloquy with Sims regarding his right to a court-appointed lawyer, difficulties in self-representation, and how a lawyer could benefit him. The court stopped multiple times mid-explanation to ask Sims if he understood what the court was conveying, to which Sims responded, "I do, Your Honor." The court asked Sims if the decision was "entirely voluntary on [his] part," to which Sims responded, "Yes, it is Your Honor." Further, at the June 10 hearing, Sims confirmed that he read through everything on the waiver, had reviewed it with his newly-appointed counsel, fully understood his rights, and had no questions about it. Sims's counsel and the State confirmed on the record that they believed Sims's waiver was knowing, intelligent, and voluntary. Additionally, Sims wrote in his second motion that he was "aware of the dangers of appearing Pro-Se, Honorable Judge George Appel has explained them to me." And Sims also signed a written waiver of the right to counsel.

13

Id. at 488 (citations omitted).

Sims initially filed a "Motion to Dismiss Counsel" in April 2022, in which he sought removal of counsel based on alleged ineffective assistance, accompanied by a request to proceed pro se. At the hearing on the motion, Sims expressed frustrations with his assigned counsel and explained that he wanted to go pro se because he was concerned he would be reassigned counsel he did not want, based on information from "numerous guys in [his] pod." Sims stated he did not think any attorney would file the 19 motions he sought, leaving him to "feel like [he was] being forced to go pro se, at this time, to get the answers or the results that I want."

Sims explained that he did not want to waste the court's time because he would fire certain counsel if they were appointed and he did not want to "go through this process again." The court told Sims that it would not be an option to continue to move to discharge counsel until he got an attorney he wanted. The court engaged in an extensive colloquy with Sims where it explained the full scope of Sims's exposure, the logistical consequences of representing himself from jail, the consequences of the waiver, the lack of guarantee of standby counsel, and the difference between affirmatively wanting to represent himself and being dissatisfied with current counsel. The court made clear to Sims that it would not help him and that he would be held to the same standards as an attorney.

The trial court then asked Sims again if he "want[ed] to give up [his] lawyer." Sims replied, "Yes, actually, Your Honor, I am asking the Court to proceed pro se at this point." When asked if his decision was voluntary, Sims answered in the affirmative and further stated:

As I said, there's going to be no attorney that wants to do the motions that I need to have put forth or not. They're not -- the only way those motions are going to get put forth is myself; I'm going to have to do them myself.

The State expressed concern that Sims's request was not unequivocal but instead "a fear that he would get assigned conflict counsel that [he did not want]," and suggested giving Sims until the next week "to think about it before entering this." The court then confirmed with Sims and his counsel that there was a breakdown in communication and trust such that current counsel could no longer adequately represent Sims.[8] The court then explained its thinking to Sims:

If your reason for waiving your right to an attorney is just because you don't like the other possible chances or the other possible lawyers who might represent you, then it almost seems as though your motion is driven by a concern that specific lawyers aren't going to do what you want, rather than no possible lawyer could represent you; am I right about that or wrong?

Sims responded:

In part, you're right; in part . . . that is partially also the driving force behind me wanting to proceed pro se. If I'm going to get those -- either one of those two attorneys, out of respect to you, Your Honor, and to the courts, I will say again, I do not want to be back in the same situation. Like you said, you don't want me up here trying to go pro se again. I don't want to waste your time or the Court's time.

The court was not satisfied that Sims's request was unequivocal:

Well, I am not 100 percent convinced that I have heard an unequivocal waiver. And the reason why is because I think, Mr. Sims, that you are resigned to the likelihood that being released from [your current counsel]

---

[8] In oral argument on appeal, Sims characterized the conflict with his attorneys as continuous strategic differences, not breakdowns in communication that warrant dismissal of counsel. See Wash. Ct. of Appeals oral arg., State v. Sims, No. 86521-8-I (Jan. 15, 2026), at 19 min., 28 sec. through 21 min., 01 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026011402/?eventID=2026011402. Substitution of counsel is warranted only when the defendant can show "good cause, 'such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication.' " State v. Davis, 3 Wn. App. 2d 763, 790, 418 P.3d 199 (2018) (internal quotation marks omitted) (quoting State v. Thompson, 169 Wn. App. 436, 457, 290 P.3d 996 (2012)). " 'A disagreement over defense theories and trial strategy does not by itself constitute an irreconcilable conflict.' " Id. (quoting Thompson, 169 Wn. App. at 457).

would result in another lawyer that you don't like. . . . It doesn't sound to me as though you're saying you like the idea of being your own lawyer. You just don't like the idea of certain people representing you; did I state that correctly?

Sims responded:

To a point, Your Honor, and I blatantly said that, Your Honor. I told you, from the get-go, I feel like I'm being forced to go pro se. . . . So, yes, I don't want to proceed pro se. I feel like I have to proceed pro se, if I'm going to end up with either one of those attorneys.

The court reaffirmed its conclusion that Sims's request was not unequivocal:

I don't think you really do want to be pro se. I think, deep down, you just assume to be pro se, and possibly because you are understanding perfectly well that your situation isn't likely to get better if you're all on your own and that's accurate. So I'm not going to find that you are waiving your right to counsel.

The court then ordered reassignment of counsel. Sims asked the court for clarification about whether he would be able to move to represent himself in the future and asked if they could discuss the issue the following week. The court confirmed that Sims could still bring a motion to represent himself and reserved ruling on the issue. The court also explained that it would go through the same colloquy with him, "refer back to this conversation," and decide if the waiver is equivocal.

The next week, on May 20, the court appointed Sims new counsel. At that hearing, the court reminded Sims why new counsel was appointed:

The whole reason for setting this hearing is because I don't want you to be without counsel since you didn't waive. Remember, you were a little ambiguous at the end as to whether you wanted to waive your right, and that's why I said, well, I'll get you a lawyer. So that's where we are. So we're there right now. If, in the future, you wish to bring a motion to go pro se, I will hear it, and we will have a colloquy just like the one we had last week, or similar to it, I should say.

16

One week later, on May 27, Sims filed a handwritten motion, this time labeled "Affidavit and Motion to Proceed Pro Se," affirmatively invoking the right to self-representation. Two weeks after that, on June 10, the court heard Sims's motion. Sims's newly appointed counsel began the hearing, stating:

> [DEFENSE COUNSEL]:   Mr. Sims is capable of representing himself and understands what is entailed in representing himself. And he wants to do that. Is that a fair recitation of your motion, Mr. Sims?
>
> THE DEFENDANT:   Yes, it is. I just refiled it.
>
> . . . .
>
> [DEFENSE COUNSEL]:   It's clear from the conversation . . . that Mr. Sims feels like he is best represented if he does this himself.

Sims affirmed to the court that he understood the waivers read to him at the May 13 hearing and that his goal was to "mak[e] it affirmatively and unequivocally [clear] that I choose to proceed pro se. I believe in this case I can best represent myself." His motion also stated, "I now make an affirmative and unequivocal request to go Pro-Se." The court reviewed with Sims the logistical complications of representing himself from jail, then asked Sims if he had "any questions about what it would be like to be pro se and not have a lawyer do all those sorts of lawyerly things." After Sims replied that he had no questions, the court found that Sims had made an unequivocal request based on the colloquy that day and the "very exhaustive conversation last time." Sims signed a written waiver of the right to counsel that day.

Nevertheless, Sims now argues that his request to represent himself was not unequivocal because it was based on dissatisfaction with his attorneys. But a "request is not necessarily rendered equivocal simply because it is motivated by a purpose other

than a desire to [self-]represent . . . such as frustration with the speed of trial or an attorney's performance." Curry, 191 Wn.2d at 489. Indeed, a "request to represent oneself may be stated in the alternative of a request for new counsel." Stenson, 132 Wn.2d at 741. Further, Sims's May 27 motion and Sims's statements at the June 10 hearing expressed an affirmative belief by Sims that he was in the best position to represent himself, not merely that he was dissatisfied with his attorneys.

Even if a defendant believes they have "no choice" but to represent themselves, a self-representation request is not equivocal if the rest of the record demonstrates it is unequivocal.[9] For example, in Curry, the defendant moved to represent himself after he was appointed a new defense attorney who "determined that he would not be ready for trial by the scheduled date and thus sought a continuance." 191 Wn.2d at 480. Curry moved to either substitute counsel or represent himself because he was "unwilling to accept a trial delay." Id. In his motion, Curry stated " 'that he is expressing this desire [to represent himself] with knowledge of the possible risks and without any equivocation.' " Id. The trial court granted Curry's request to represent himself after engaging in an extensive colloquy and "repeatedly" advising Curry that self-representation was unwise. Id. at 480-81. Our Supreme Court held that the trial court did not abuse its discretion by granting the motion, despite the fact that Curry stated "several times that he felt he had 'no choice' but to represent himself," id. at 481, because:

> The record gives no indication that Curry's request was inadvertent or accidental; it was not simply an "expression of frustration," though

---

[9] In Sims's briefing, he relies on *this* court's decision in State v. Curry, where we held that "[t]he qualifications attached to Mr. Curry's request for self-representation constituted equivocation." 199 Wn. App. 43, 45, 398 P.3d 1146 (2017). But the Supreme Court reversed that decision and articulated the rules described herein. Sims mistakenly states that our decision in Curry was affirmed and cites to the Supreme Court's grant of review, not the Supreme Court's decision. Compare State v. Curry, 189 Wn.2d 1009, 403 P.3d 41 (2017) (order granting review), with Curry, 191 Wn.2d 475 (2018) (Supreme Court opinion).

frustration may have been the motivation; and it was not a spontaneous comment or a musing on the benefits of self-representation. Curry repeatedly expressed a desire to represent himself. He made a request to proceed pro se in a written motion, which he discussed at length with the trial judge in a scheduled hearing.

Id. at 494.

By contrast, in Stenson, our Supreme Court held it was not an abuse of discretion for the trial court to deny the defendant's request to represent himself because "[w]hile the Defendant's request was conditional, it was also equivocal based on the record as a whole." 132 Wn.2d at 742. Stenson requested substitute counsel, or in the alternative, to represent himself, because his counsel would not accuse someone else of the crime. Id. at 730-31, 734. In the ensuing colloquy,

[A]lmost all of the conversation between the trial judge and the Defendant concerned his wish for different counsel. He repeatedly discussed which new counsel should be assigned. He explained he had contacted a number of attorneys and had asked for permission to talk with his newly-selected counsel. He told the trial court he did not want to represent himself but that the court and his counsel had forced him to do that. More importantly, the Defendant did not refute the trial court's final conclusion that he "really [did] not want to proceed without counsel."

Id. at 742. After the trial court denied the request, the defendant "filed a written request which sought appointment of new lead counsel, [and] retention of the existing second counsel" without mentioning proceeding on his own. Id. Based on the context and the record as a whole, the court held that the trial court did not abuse its discretion in denying the request to self-represent. Id.

In State v. Mehrabian, this court also affirmed a trial court's grant of the defendant's request to self-represent even though the request was motivated in part by dissatisfaction with counsel. 175 Wn. App. 678, 695, 308 P.3d 660 (2013), abrogated on other grounds by State v. Schwartz, 194 Wn.2d 432, 450 P.3d 141 (2019). There, a

19

death in the defendant's retained counsel's family caused the defendant to move for a mistrial, and a month later, the defendant requested to represent himself because he felt retained counsel did not have " 'appropriate questions' " and therefore felt self-representation was " 'the only option that I'm left with.' " Id. at 686. The trial court advised the defendant he had a right to have counsel appointed at public expense, and the defendant explained he did not want that. Id. The trial court also advised the defendant of the risks of representing himself and asked whether the defendant wanted to give up his right to counsel, which the defendant affirmed. Id. at 687.

"A short time later," the trial court became concerned that the defendant's request was equivocal because the defendant later stated, " 'Up to today I was determined . . . to go [ ] pro se. But after listening to you I'm not quite sure to be honest with you." Id. The trial court then "repeatedly" asked the defendant what he wanted to do and the defendant "consistently said he wanted to proceed pro se with . . . standby counsel." Id. The defendant argued on appeal that he never made an unequivocal request to represent himself and that his waiver of his right to counsel was conditioned upon the appointment of standby counsel. Id. at 691-92. We disagreed, reasoning that the defendant expressed that "he was in the best position to understand the evidence and defend the case" and signed a written waiver of his right to counsel. Id. at 694. Further, the trial court "engaged Mehrabian in colloquies to determine whether he understood the nature and consequences of proceeding pro se." Id. Accordingly, we held "[t]hat Mehrabian chose to proceed pro se partly because he was dissatisfied with counsel does not constitute an equivocal request." Id. at 695.

Similar to the defendant in <u>Curry</u>, Sims expressed his desire to represent himself multiple times. His second written motion explicitly stated, "I now make an affirmative and unequivocal request to go Pro-Se." And, instead of being titled "Motion to Dismiss Counsel" like his first motion, Sims's second motion was titled "Motion to Proceed Pro-Se," reflecting the considered nature of Sims's second request. Further, like the court in <u>Curry</u>, the trial court here engaged in an extensive colloquy with Sims and advised him that self-representation was unwise. Although Sims at one point stated he felt he was "forced" to represent himself, he later clarified that "it's not a feeling of I'm forced to be doing it." Like in <u>Curry</u>, it is clear from the record that Sims's request was beyond an "expression of frustration" and was not spontaneous. <u>See</u> <u>Curry</u>, 191 Wn.2d at 494. Indeed, Sims affirmed at the June 10 hearing that he "spent [a] week thinking about" his motion to represent himself after the May 13 hearing and chose to refile it. Further, like the defendant in <u>Mehrabian</u>, Sims signed a written waiver of his right to counsel after engaging in extensive colloquy with the trial court. Sims and his counsel affirmatively expressed at the June 10 hearing that Sims believed he could best represent himself. Indeed, compared to the record in <u>Mehrabian</u>, the record here even more strongly demonstrates Sims's second request was unequivocal. Whereas the defendant in <u>Mehrabian</u> expressed hesitance after mulling over the trial court's words,[10] Sims doubled down on his desire to represent himself at the June 10 hearing, stating:

> As you told me, I should think about this. I spent that week thinking about it. And since you appointed me counsel on the 20th, you were like, well, if you would wish to proceed pro se, just refile it. So I refiled it.

---

[10] <u>Mehrabian</u>, 175 Wn. App. at 687 ("Up to today I was determined to be . . . to go that pro se. But after listening to you I'm not quite sure to be honest with you").

And in his second motion, Sims affirmed he understood the dangers of representing himself.

While Sims's posture at the May 13 hearing may have mirrored that of the defendant in Stenson, his position had changed by his second motion and hearing, as described above. Indeed, Sims's request in his second motion was not even conditional, let alone equivocal, unlike the request in Stenson, which sought self-representation as an alternative to appointment of new counsel.

Finally, while "a trial court's finding of equivocation may not be justified by referencing future events then unknown to the trial court," State v. Madsen, 168 Wn.2d 496, 507, 229 P.3d 714 (2010), here, even after the trial court granted his motion to represent himself, Sims continued to affirm on the record his desire to represent himself. For example, when Sims moved for standby counsel and the trial court granted it, the court reminded Sims he could revoke his waiver of the right to counsel, and Sims declined:

> THE COURT:   I have a little recommendation for you. And you probably know what it is.
>
> THE DEFENDANT:   I believe it's the same thing you've mentioned every court date, Your Honor. I'm all right with that though.
>
> . . . .
>
> THE COURT:   The wise thing to do would be to ask me if you could take back your waiver.
>
> THE DEFENDANT:   I'm all right with that, Your Honor. I'll pass again for the fifth or sixth time.[11]

---

[11] Sims later moved to discharge standby counsel because he did not trust his standby counsel nor believe he needed "assistance for any kind of questions [he was] going to have with regard to legal processes." Sims reiterated that he had "been pro se for a year and a half . . . I made this choice a long time ago and I stand firmly to remove him as my standby counsel." The trial court asked again if Sims was "absolutely unequivocally wanting to represent yourself," to which Sims responded, "This is correct, Your

Accordingly, we conclude that the trial court did not abuse its discretion in determining that Sims's request to represent himself was unequivocal.

III.  Unlawful Possession of Firearm

Sims was charged with unlawful possession of a firearm in the first degree based on his prior convictions of residential burglary, a nonviolent felony, and assault in the second degree, a violent felony. Both prior convictions count as most serious, or "strike," offenses under Washington's "Persistent Offender Accountability Act" (POAA), RCW 9.94A.030. Sims stipulated to both convictions as the bases for the unlawful possession charge.

Sims argues that RCW 9.41.040,[12] which makes it a crime for a person with a felony conviction to possess a firearm, is unconstitutional as applied to him because "[o]ur nation's history does not justify firearm restrictions for persons with a prior conviction such as Mr. Sims." But we have previously held that Washington's disarmament statute is constitutional as applied to persons with the same prior convictions as Sims. See State v. Ross, 28 Wn. App. 2d 644, 645, 537 P.3d 1114 (2023), review denied, 2 Wn.3d 1026, 544 P.3d 30 (2024) (rejecting both facial and as-applied challenges by person with a prior felony burglary conviction); State v. Bonaparte, 32 Wn. App. 2d 266, 268, 554 P.3d 1245 (2024) (holding statute is constitutional as applied to a person with a prior assault conviction).

_____

Honor. This has been the case for the last year and a half." The trial court clarified that, with regard to standby counsel, Sims would not have to "talk to him," "look at him," or "breathe in his direction." Sims replied: "I don't know that I can be more clear, Your Honor. I'm perfectly fine going forward without him. That's what I choose to do. I appreciate it."

[12] While the version of RCW 9.41.040 applicable to this case has since been amended, as the relevant language has not changed, Sims cites to the current statute, as do we.

Sims urges us to disregard this precedent, arguing that " 'longstanding prohibitions on the possession of firearms by felons'[13] can only mean prohibitions in existence at the time of the founding" due to the "explication of historical tradition" in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). Relying on United States v. Rahimi, 602 U.S. 680 (2024), Sims argues that "there was no basis in a prior armed crime or unlawful use of weapons that could be comparable to offenses having a tradition of warranting firearms prohibitions going forward." We recently rejected this same argument in State v. Hamilton, 33 Wn. App. 2d 859, 565 P.3d 595, review granted, 4 Wn.3d 1037, 572 P.3d 1206 (2025). There, we noted that while "[i]t is true that there were no express firearms bans based on felony status at the time of our nation's founding," New York State Rifle requires only a "historical analogue." Id. at 872. Then, we explained that there is a historical analogue for Washington's disarmament statute insofar as at the time of our nation's founding, the death penalty—which "subsumes disarmament"—was a means of punishing a broad range of felony cases including nonviolent offenses. Id. at 873.

Accordingly, for the reasons articulated in Hamilton, Ross, and Bonaparte, we deny Sims's constitutional challenge to his conviction for unlawful possession of a firearm in the first degree under RCW 9.41.040 based on his prior felony convictions of residential burglary and assault in the second degree.

---

[13] Sims quotes District of Columbia v. Heller, 554 U.S. 570, 627 (2008).

CONCLUSION

Affirmed.

Chung, J.

WE CONCUR:

Díaz, J.